FILED

ORDERED PUBLISHED

JUL 25 2012

SUSAN M SPRAUL, CLERK
U.S. BKCY. APP. PANEL
OF THE NINTH CIRCUIT

U.S. COURTS

UNITED STATES BANKRUPTCY APPELLATE PANEL

OF THE NINTH CIRCUIT

JUL 3 0 2012

Rcvd_____Filed A-18 Time 11:52a
ELIZABETH A. SMITH
CLERK, DISTRICT OF IDAHO

BAP No.   ID-11-1389-MkHJu

Bk. No.   09-41646

In re:

ANDY N. SALGADO-NAVA,

        Debtor.

R. SAM HOPKINS, Chapter 7
Trustee,

        Appellant,

v.

ASSET ACCEPTANCE LLC; RECOVERY
MANAGEMENT SYSTEMS CORP.;
BONNEVILLE BILLING &
COLLECTIONS; NCO PORTFOLIO
MANAGEMENT; EASTERN IDAHO RMC;
SPRINT NEXTEL CORRESPONDENCE;
AMERICAN INFOSOURCE LP,

        Appellees.*

O P I N I O N

Argued and Submitted on June 14, 2012
at Boise, Idaho

Filed - July 25, 2012

Appeal From The United States Bankruptcy Court
for the District of Idaho

---

*Appellant named all unsecured creditors who filed proofs of claim in the debtor's bankruptcy case as appellees.  While none of them actively participated in the bankruptcy court proceedings leading up to this appeal or in the appeal itself, naming them as appellees was not inappropriate because each of them might be affected by the relief appellant seeks on appeal.  See generally Int'l Ass'n of Firefighters, Local 1186 v. City of Vallejo (In re City of Vallejo), 408 B.R. 280, 298-99 (9th Cir. BAP 2009) (discussing criteria for appellee standing).

Honorable Jim D. Pappas, Bankruptcy Judge, Presiding

————————————————

Appearances:   Monte Gray of the Gray Law Offices, PLLC argued
               for appellant R. Sam Hopkins, chapter 7 trustee;
               Ronald R. Peterson of Jenner & Block LLP argued
               for amici curiae Jeremy Gugino and the National
               Association of Bankruptcy Trustees; and
               Cameron M. Gulden argued for amicus curiae the
               Office of the United States Trustee.

————————————————

Before:   MARKELL, HOLLOWELL and JURY, Bankruptcy Judges.

MARKELL, Bankruptcy Judge:

## INTRODUCTION

R. Sam Hopkins ("Hopkins") sought $1,315.41 in fees for his service as a chapter 7[1] bankruptcy trustee.  He based his request on the trustee compensation rates set forth in § 326(a).  The bankruptcy court, however, found that the reasonable value of his services only amounted to $750 and limited Hopkins's fees to that amount.

We REVERSE the bankruptcy court's fee award and REMAND with instructions to enter a fee award of $1,315.41, the full amount Hopkins requested.

## FACTS

Andy N. Salgado-Nava ("Salgado-Nava") commenced his voluntary chapter 7 bankruptcy case by filing his bankruptcy petition on October 22, 2009.  Hopkins was then appointed to

---

[1]Unless specified otherwise, all chapter and section references are to the Bankruptcy Code, 11 U.S.C. §§ 101–1532, and all Rule references are to the Federal Rules of Bankruptcy Procedure, Rules 1001–9037.

1  serve as trustee for Salgado-Nava's chapter 7 bankruptcy estate.

2      Hopkins initially determined that there were no non-exempt

3  assets to distribute to creditors.  He thus categorized Salgado-

4  Nava's case, in line with most chapter 7 cases, as a no-asset

5  case.[2]  Hopkins had reached his decision after performing a

6  number of tasks, including reviewing Salgado's schedules, his

7  statement of financial affairs, his tax returns, and his

8  responses to Hopkins's examination questions at the first meeting

9  of creditors held pursuant to § 341(a).  Because of Hopkins's no-

10  asset determination, creditors and other parties in interest were

11  told in January 2010 not to file proofs of claim in the case.

12  See Rule 2002(e).  Hopkins's only income expectation was a small

13  $60 fee.[3]

14

_____

15      [2]Approximately 90% of all chapter 7 cases are classified as
no-asset cases.  LOIS R. LUPICA, THE CONSUMER BANKRUPTCY FEE STUDY FINAL
16  REPORT 47 (2011), available at
http://bapcpafeestudy.com/tag/final-report/ (last visited July
17  20, 2012) (finding 89.4% of chapter 7 cases after the 2005
Bankruptcy Code amendments are no-asset cases); see also W.
18  Clarkson McDow, Jr., Protecting the Integrity of the Bankruptcy
System in Chapter 7 No-Asset Cases, NABTALK (Fall 2001),
19  available at
http://www.justice.gov/ust/eo/public_affairs/articles/docs/nabtal
20  kfall2001.htm (last visited July 20, 2012) (estimating
approximately 96% of chapter 7 cases were no-asset cases).
21      That no-asset cases are all-too-common is underscored by
22  Rule 2002(e), which allows trustees and clerks generally to tell
creditors to dispense with filing proofs of claim unless the
23  creditors are later notified that there will be assets to
24  disburse.

25      [3]In a no-asset case such as Salgado-Nava's, Hopkins and all
26  other trustees receive only a $60 fee, regardless of how much
work is undertaken.  § 330(b)(1) & (2).  This amount has not
27  changed since 1994, and Congress has not made this amount subject
to the Code's provision indexing various amounts for inflation.
28                                          (continued...)

3

1    But Hopkins had also sent routine notices to various taxing

2  authorities, including the State of Idaho.  These notices told of

3  Salgado-Nava's bankruptcy filing.  They also requested that the

4  recipients advise Hopkins of any tax refunds owed to Salgado-

5  Nava, as Hopkins claimed that such refunds were property of the

6  bankruptcy estate under § 541.

7    These notices brought results.  As it turned out, Salgado-

8  Nava had overpaid his state taxes for 2009 and 2010 by

9  approximately $10,000.  In compliance with the notices, Idaho

10  sent Hopkins Salgado-Nava's tax refunds.  Hopkins then withdrew

11  his no-asset report.  He also issued a new notice advising

12  creditors that there might be a distribution of assets and

13  directing them to file proofs of claim in order to share in that

14  distribution.  Seven creditors, appellees here, did so.

15    After Hopkins received the tax refunds, Salgado-Nava amended

16  his bankruptcy schedules to list the tax refunds as assets and to

17  claim $4,160 of his 2009 refund as exempt.  No one contested

18  Salgado-Nava's exemption claim.  As a consequence, the exemption

19  was deemed allowed pursuant to § 522(l) and Rule 4003(b).  Part

20  of his 2010 refund also was excluded from the estate.[4]

21    When all was said and done, Hopkins collected $11,099 in

22  assets.  He paid $5,445 to Salgado-Nava in respect of his allowed

23  exemptions, which left $5,654 available to pay creditor dividends

24

25    [3](...continued)
See § 104.

26

27    [4]Hopkins paid Salgado-Nava $1,285 of the 2010 refund because
he determined that it had accrued postpetition, and thus was not

28  property of the estate as it related to postpetition service
income.  See § 541(a)(6).

1   and Hopkins's chapter 7 trustee fees and expenses.  Based on the

2   trustee compensation rates set forth in § 326(a),[5] Hopkins filed

3   a request in March 2011, along with his Final Report, asking the

4   bankruptcy court to award him fees in the amount of $1,315.41,

5   plus actual expenses of $46.10.[6]

6       Before hearing the matter, the bankruptcy court requested

7   Hopkins provide additional information.  Specifically, the court

8   requested Hopkins file:

9       a sworn affidavit in support of his requested
        compensation and expenses which includes an itemization
10      setting for[th] the date and time spent providing all
        services rendered by Trustee for which he seeks
11      compensation, together with a narrative discussion or
        explanation of any other information he wishes the
12      Court to consider in support of his application.

13  Order to Trustee to File Supplementation of Record (April 12,

14  2011) at p. 1.

15      In response, Hopkins filed a one-page document entitled

16  "Supplement to Trustee Fee Application," which provided a brief

17  narrative summary of the services that Hopkins had provided in

18  ────────────────────

19      [5]Those rates are based on amounts disbursed or turned over
    by the trustee to parties in interest other than the debtor
20  according to the following schedule: 25% of the first $5,000 or
    less; 10% for amounts in excess of $5,000 but not in excess of
21  $50,000; 5% for amounts in excess of $50,000 but not in excess of
    $1,000,000; and 3% for amounts in excess of $1,000,000.  See
22  § 326(a).

23      [6]The Idaho district court had jurisdiction over the fee
24  request as a matter "arising under" title 11, 28 U.S.C.
    § 1334(b), and then referred to the bankruptcy court from the
25  district court under the district court's general order of
    reference permitted by 28 U.S.C. § 157(a).  THIRD AMENDED GENERAL
26  ORDER NO. 38 (D. Idaho April 24, 1995).  The fee request was a
    core matter under 28 U.S.C. § 157(b)(2)(A), and thus the
27  bankruptcy court could hear and determine the matter under 28
    U.S.C. § 157(b)(1).
28

1   the bankruptcy case.   It also summarized the results of those

2   services: Hopkins had cash on hand which he estimated would be

3   sufficient, after the payment of his requested trustee's fees, to

4   pay $4,292 to unsecured creditors who had filed proofs of claim.

5   This would result in a 39% dividend to creditors.

6       The Trustee also filed time records detailing the amount of

7   time and services he and his staff had performed in the

8   bankruptcy case.   According to Hopkins, he and his staff spent

9   approximately 14 hours on the case:   Hopkins personally spent

10  3 hours, his bankruptcy administrator spent 6 hours, his office

11  clerk spent 1 hour, and his paralegals accounted for the final

12  4 hours.

13      After the hearing, the bankruptcy court issued a memorandum

14  decision awarding Hopkins only $750 of the $1,315.41 in fees

15  requested.   Relying on In re B & B Autotransfusion Servs., Inc.,

16  443 B.R. 543 (Bankr. D. Idaho 2011), and on the other cases cited

17  in B & B, the court held that $750 was a reasonable fee for

18  Hopkins's services.   According to the court, based on its

19  consideration of the extent and difficulty of the services

20  Hopkins and his paralegals had provided, the requested fees were

21  unreasonable.   In making this determination, the court reasoned:

22      The only assets requiring administration by Trustee in
        this case were Debtor's tax refunds.   Trustee has not
23      shown that any significant efforts on his part were
        required to secure the refunds from Debtor; apparently,
24      Debtor surrendered them to Trustee promptly.   Beyond
        accepting and holding the tax refunds, Trustee was
25      required to perform only routine, simple administrative
        tasks in this case.   While all of those services are
26      compensable (i.e., actual and necessary), they required
        no special skills or expertise, and required no
27      significant amounts of time to complete.   Indeed, most
        of those services were not performed personally by
28      Trustee at all, but, instead, were provided by

                                    6

1   Trustee's support staff of "paralegals" and
    others. . . .  When the Court focuses upon only those
2   services of Trustee and his paralegals, and assigns
    appropriate reasonable value to those services, the
3   requested fee is not a reasonable one.

4   Mem. Dec. (June 23, 2011) at pp. 3-4 (footnote omitted).

5       In addition, the bankruptcy court rejected Hopkins's

6   argument that, under § 330(a)(7), he should receive $1,315.41 in

7   fees as a commission based on the compensation rates set forth in

8   § 326(a).  As the court put it, § 326(a) in essence "caps"

9   trustee compensation but does not alter or limit the court's duty

10  and authority to determine a reasonable fee.

11      On June 30, 2011, the bankruptcy court entered its order

12  approving Hopkins's Final Report and awarding Hopkins $750 in

13  fees and $46.10 in expenses.  The Trustee timely filed a notice

14  of appeal on July 13, 2011, which gave us jurisdiction under 28

15  U.S.C. § 158(b).

16                          **DISCUSSION**

17  **A.   Standard of Review**

18      Although this Panel reviews a bankruptcy court's fee award

19  pursuant to § 330(a) for abuse of discretion, Ferrette & Slater

20  v. U.S. Trustee (In re Garcia), 335 B.R. 717, 723 (9th Cir. BAP

21  2005), we still must "determine de novo whether the [bankruptcy]

22  court identified the correct legal rule to apply to the relief

23  requested."  United States v. Hinkson, 585 F.3d 1247, 1262 (9th

24  Cir. 2009) (en banc).  And that is the issue here: what is the

25  "correct legal rule" set forth in § 330(a)(7)?

26  **B.   Interpreting § 330(a)(7)**

27      We start with the paragraph's provenance.  Congress added

28  § 330(a)(7) when it adopted § 407 of the Bankruptcy Abuse

                               7

1  Prevention and Consumer Protection Act of 2005, Pub. L. 109-8,

2  § 407, 119 Stat. 23, 106 (2005) ("BAPCPA").   To determine what

3  this new paragraph means and what it added, we begin with the

4  text of the statute itself.   Ransom v. FIA Card Servs., N.A., ---

5  U.S. ----, 131 S. Ct. 716, 723-24, 178 L. Ed. 2d 603 (2011)

6  (quoting United States v. Ron Pair Enters., Inc., 489 U.S. 235,

7  241 (1989)).

8       Section 330(a)(7) provides:

9            In determining the amount of reasonable compensation to
             be awarded to a trustee, the court shall treat such
10           compensation as a commission, based on section 326.

11  Somewhat surprisingly, the published decisions construing this

12  paragraph conclude that it added little to the law of trustee

13  compensation.   These decisions rest primarily on the view that

14  trustee compensation is always subject to a review for

15  reasonableness.   See, e.g., In re B & B Autotransfusion Servs.,

16  Inc., 443 B.R. 543, 550 (Bankr. D. Idaho 2011); In re Healy, 440

17  B.R. 834, 835-36 (Bankr. D. Idaho 2010); In re Ward, 418 B.R.

18  667, 675-78 (W.D. Pa. 2009); In re Coyote Ranch Contractors, LLC,

19  400 B.R. 84, 94-95 (Bankr. N.D. Tex. 2009); In re McKinney, 383

20  B.R. 490, 493-94 (Bankr. N.D. Cal. 2008); In re Phillips, 392

21  B.R. 378, 389-90 (Bankr. N.D. Ill. 2008) In re Mack Props., Inc.,

22  381 B.R. 793, 799 (Bankr. M.D. Fla. 2007); In re Clemens, 349

23  B.R. 725, 729-31 (Bankr. D. Utah 2006).

24       There is, however, an alternate view of § 330(a)(7).   This

25  view, adopted by the Office of the United States Trustee,[7]

26  _____

27       [7]Trustee Compensation, in FREQUENTLY ASKED QUESTIONS (FAQs) FOR
     TRUSTEES (2006), available at

28                                              (continued...)

8

1  focuses on § 330(a)(7)'s terms – particularly the use of the term

2  "commission" – which seem to alter the court's role in reviewing

3  trustee compensation.  See Kenneth N. Klee & Brendt C. Butler,

4  The Bankrutpcy Abuse Prevention and Consumer Protection Act of

5  2005 – Business Bankruptcy Amendments, 28 CAL. BANKR. J. 270, 336

6  (2006) (stating that § 330(a)(7) is "supposed to ensure that the

7  court will award compensation to a trustee on a commission basis

8  using the upper limit in section 326 as a standard"); see also

9  Tally M. Wiener & Nicholas B. Malito, On the Nature of the

10 Chapter 7 Bankruptcy Trustee Fee, 18 NORTON J. BANKR. L. & PRAC.

11 No. 2, Art. 3 (2009) ("The nature of the Chapter 7 trustee fee

12 under the revised Bankruptcy Code is that it is a commission.  It

13 makes sense from a policy perspective to award Chapter 7 trustees

14 commission-based awards because this method of compensation

15 focuses on results achieved."); Samuel K. Crocker & Robert H.

16 Waldschmidt, Impact of the 2005 Bankruptcy Amendments on Chapter

17 7 Trustees, 79 AM. BANKR. L.J. 333, 364 (2005) (stating that

18 § 330(a)(7) "appears to overrule the circuit court decisions

19 which have computed trustee compensation pursuant to the lodestar

20 method, adjusted by enhancing factors such as the complexity of

21 the case and extraordinary results.").

22    **1.    Parsing § 330(a)(7)**

23      It is against this background of published cases,

24 administrative commentary, and academic opinion that we interpret

25 § 330(a)(7).  On its face, § 330(a)(7) is made up of an

26

27      [7](...continued)
   http://www.justice.gov/ust/eo/bapcpa/trustees_faqs.htm#trust_issue4
28 (last visited July 20, 2012).

introductory dependent clause – "In determining the amount of reasonable compensation to be awarded to a trustee" – followed by an independent clause – "the court shall treat such compensation as a commission, based on section 326." In reading this statutory directive, we think the most natural reading of this provision is that the independent clause states a mandatory rule, while the dependent clause states when that rule applies.

### a.    The Commission Clause

If this reading is accepted, it means that we should start with the independent clause – which we will call the commission clause. On its face, this clause requires bankruptcy courts to treat a trustee's fee request as if the trustee were requesting payment of a commission – a fixed amount – based on the rates set forth in § 326. If correct, this reading would change our prior view that § 326 simply "capped" trustee compensation by setting forth maximum compensation rates. See Arnold v. Gill (In re Arnold), 252 B.R. 778, 788 n.12 (9th Cir. BAP 2000).

This change is warranted. Congress's addition of the commission clause changed both the function of § 326 and its relationship with § 330(a). The amendment fixed a statutory commission for chapter 7 trustees tied to – or, in the language of the last provision of the commission clause, "based on" – § 326's compensation scheme.

No other reading of the phrase "based on section 326" seems plausible, especially given the use of the word "commission." If Congress did not want to link a trustee's commission to the rates set forth in § 326, it could have ended the commission clause after the word "commission;" that is, it could have omitted the

phrase "based on section 326." Or it could have created a new and separate list of commission rates. Moreover, if Congress had merely meant to reiterate in § 330(a)(7) that a trustee's commission was subject to the caps set forth in § 326, it could have used the phrase "subject to section 326." For an example of how that phrasing would work, one only has to look at § 330(a)(1) ("subject to section[] 326, . . . the court may award . . .").

But Congress chose to use different words to refer to § 326 in §§ 330(a)(1) and (a)(7). The use of different words presumably means that Congress intended that the different words had different meanings and effects. See Sosa v. Alvarez-Machain, 542 U.S. 692, 711 n.9 (2004). Put another way, standard canons of statutory interpretation require us to give "based on section 326" a different interpretation from one we would give if the phrase read, as its cognate phrase in § 330(a)(1) does, "subject to section 326." In short, we follow established precedent by giving each word and provision of the commission clause meaning. See Corley v. United States, 556 U.S. 303, 314 (2009) ("[a] statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant . . ." (internal quotation marks omitted)); see also Meyer v. Renteria (In re Renteria), 470 B.R. 838, 843 (9th Cir. BAP 2012) (interpreting § 1322(b)(1) so as to give effect to all of the words and phrases in the statute).

That said, we need to examine the remainder of the commission clause, including the relationship the phrase "based on" has to the word "commission" and, in turn, the meaning of the word "commission." One key indicator of the substantive

1 relationship among these terms and phrases is indicated by the

2 spatial relationship of each in the statute's text.  The words

3 "based on" follow the main portion of the commission clause, a

4 placement and ordering which generally means that the former

5 limits, qualifies or refines the meaning of the latter.  See In

6 re Renteria, 470 B.R. at 842 (citing 2A NORMAN J. SINGER, SUTHERLAND

7 ON STATUTORY CONSTRUCTION § 47.33 (7th ed. 2011) (explaining the rule

8 of the last antecedent).  In short, the use of "commission"

9 before the words "based on" indicates that the normal meaning of

10 commission starts the analysis of the main text, with the

11 addition of "based on section 326" indicating a refinement or

12 limitation of that accepted meaning.

13      Turning to the accepted meaning of "commission" in normal

14 parlance, a "commission" is a form of compensation set as a fixed

15 percentage of what is sold or transferred.  See BLACK'S LAW

16 DICTIONARY 306 (9th ed. 2009) (defining commission as "[a] fee

17 paid to an agent or employee for a particular transaction,

18 usu[ally] as a percentage of the money received from the

19 transaction <a real-estate agent's commission>."); OXFORD ENGLISH

20 DICTIONARY (2d ed. 1989), available at

21 http://www.oed.com/view/Entry/37135 (last visited July 20, 2012)

22 (defining commission as "[a] remuneration for services or work

23 done as agent, in the form of a percentage on the amount involved

24 in the transactions; a pro rata remuneration to an agent or

25 factor.").

26      Outside of bankruptcy, commissions generally are not subject

27 to a review for reasonableness unless an agreed-upon commission

28 rate is not duly fixed before the commission is earned.  As

12

1   stated in the <u>Restatement (Third) of Agency</u>:

2       The amount of compensation due may be determined by the
        terms of agreement between principal and agent and may
3       be fixed in amount or made contingent on whether the
        agent achieves stated outcomes or on other
4       criteria. . . .  If an agent has a right to be paid
        compensation by a principal but the amount due cannot
5       be determined on the basis of the terms of the parties'
        agreement, the agent is entitled to the value of the
6       services provided by the agent.

7   RESTATEMENT (THIRD) OF AGENCY § 8.13, Comment d (2006).[8]

8       Much the same analysis applies in bankruptcy when, for

9   example, a court pre-approves a professional's percentage-based

10  fee or a contingency fee arrangement before the work is

11  performed.  <u>See</u> § 328.  If the fee arrangement is properly

12  authorized under § 328, the bankruptcy court does not conduct a

13  standard § 330(a) reasonableness review of contingency fees or

14  percentage-based fees it has pre-approved under § 328.  <u>See</u>

15  <u>Friedman Enters. v. B.U.M. Int'l, Inc. (In re B.U.M. Int'l,</u>

16  <u>Inc.)</u>, 229 F.3d 824, 829 (9th Cir. 2000) (citing <u>Pitrat v.</u>

17  <u>Reimers (In re Reimers)</u>, 972 F.2d 1127, 1128 (9th Cir. 1992));

18  <u>see also</u> <u>In re Confections by Sandra, Inc.</u>, 83 B.R. 729, 731-32

19  (9th Cir. BAP 1987).  Indeed, a bankruptcy court only can disturb

20  such pre-approved fees when it finds that the pre-approval of

21  such fees turned out to be "improvident in light of developments

22  not capable of being anticipated at the time" the court fixed the

23  fees.  § 328(a); <u>see also</u> <u>In re Reimers</u>, 972 F.2d at 1128.

24  _____

25      [8]This concept is not new to the law of agency.  Both the
    <u>Restatement (Second) of Agency</u> and the initial <u>Restatement of</u>
26  <u>Agency</u> articulate the same concept and reference cases and
    annotations reflecting the existence of this concept.  <u>See</u>
27  RESTATEMENT (SECOND) OF AGENCY § 443 (1958) and accompanying comments,
    annotations and cases; RESTATEMENT OF AGENCY § 443 (1933) and
28  accompanying comments, annotations and cases.

1   As a result of this analysis, the plain language of the

2   commission clause leads us to conclude that § 330(a)(7) sets

3   commissions for bankruptcy trustees based on the rates set forth

4   in § 326.  Given this, if the commission clause stood alone,

5   independent of the rest of § 330, we could immediately hold that

6   trustee fees should not be disturbed absent circumstances like

7   those required in order to disturb fees pre-approved under § 328,

8   or like the circumstances that might justify reformation or

9   rescission of a commission agreement outside of bankruptcy.

10          b.    **Section 330(a)(7)'s Dependent Clause**

11   But the commission clause does not stand alone.  We still

12   must construe the remainder of § 330(a)(7), because ascertaining

13   the plain meaning of statutory text requires a contextual

14   reading.  <u>State Comp. Ins. Fund v. Zamora (In re Silverman</u>), 616

15   F.3d 1001, 1006 (9th Cir. 2010) ("To determine plain language we

16   consider the language itself, the specific context in which that

17   language is used, and the broader context of the statute as a

18   whole." (internal quotation marks omitted)); <u>Carpenters Health &</u>

19   <u>Welfare Trust Funds for Cal. v. Robertson (In re Rufener Constr.,</u>

20   <u>Inc.)</u>, 53 F.3d 1064, 1067 (9th Cir. 1995) ("When we look to the

21   plain language of a statute in order to interpret its meaning, we

22   do more than view words or sub-sections in isolation.  We derive

23   meaning from context, and this requires reading the relevant

24   statutory provisions as a whole.")

25   This requires us to look at the dependent clause that

26   immediately precedes the commission clause.  Its wording and

27   placement suggests that bankruptcy courts still must consider the

28   reasonableness of trustee fees because it specifies that

bankruptcy courts must apply the commission clause "in determining the amount of reasonable compensation to be awarded to a trustee . . . ."  We should not ignore the contents of this dependent clause any more than we should ignore the contents of the commission clause itself.[9]

The starting place for a reasonableness analysis component of trustee compensation might be § 330(a)(3).  Before BAPCPA's enactment in 2005, § 330(a)(3) required bankruptcy courts, when considering the reasonableness of <u>all</u> trustee fees under <u>all</u> relevant chapters, including chapters 7, 11, 12, and 13, to consider:

> (A) the time spent on such services;
>
> (B) the rates charged for such services;
>
> (C) whether the services were necessary to the administration of, or beneficial at the time at which the service was rendered toward the completion of, a case under this title;
>
> (D) whether the services were performed within a reasonable amount of time commensurate with the complexity, importance, and nature of the problem, issue, or task addressed; and
>
> (E) whether the compensation is reasonable based on the customary compensation charged by comparably skilled practitioners in cases other than cases under this title.

BAPCPA changed this.  It amended § 330(a)(3) so that the only types of trustees that come within its ambit are chapter 11 trustees; chapter 7 trustees no longer are subject to its terms. BAPCPA, Pub. L. 109-8, § 407, 119 Stat. 23, 106 (2005).  As a

---

[9]Nor can we ignore the language in § 326 and elsewhere in § 330(a) indicating that bankruptcy courts are authorized to award trustee fees only to the extent those fees are reasonable.

1   consequence, the factors of reasonableness specified in paragraph

2   (3) no longer directly apply to chapter 7 trustees such as

3   Hopkins when reviewing their fee requests.

4        Section 330(a)(7), however, applies to all trustees under

5   all chapters.  This indicates a shift in treatment and analysis

6   of chapter 7 trustee fees from paragraph (3) and its catalogue of

7   factors, to paragraph (7) and its explicit incorporation of

8   commission rates.

9        But the shift was not complete.  Notwithstanding the

10  applicability of paragraph (7) to chapter 11 trustees, they are

11  still specifically included in paragraph (3) with its litany of

12  reasonableness factors.  As a result, we cannot construe

13  paragraph (7) to require a fixed commission in all cases

14  regardless of chapter.  Otherwise, we would create an absurd

15  situation in which § 330(a)(3) requires what § 330(a)(7)

16  prohibits.

17       This requires us to search for an interpretation of the

18  § 330(a)(7) that harmonizes the various provisions.  See, e.g.,

19  Nat'l Ass'n of Home Builders v. Defenders of Wildlife, 551 U.S.

20  644, 661-66 (2007); Mountain States Tel. & Tel. Co. v. Pueblo of

21  Santa Ana, 472 U.S. 237, 249 (1985).  In this endeavor, it is not

22  our role to pick and choose between statutory provisions and only

23  give effect to some of them.  See Nigg v. U.S. Postal Serv., 555

24  F.3d 781, 785-86 (9th Cir. 2009) (citing Morton v. Mancari, 417

25  U.S. 535, 551 (1974)).[10]

26  _____

27       [10]If either provision had to give way, it would be
    § 330(a)(3).  As later enacted and more specific, § 330(a)(7)
28                                              (continued...)

16

1
2

### c.   Synthesis: Fixed Commissions for Non-extraordinary Duties

3      The challenge is, if possible, to give a meaning to both

4 § 330(a)(3) and § 330(a)(7) that can be applied in all cases

5 regardless of the applicable chapter.[11]  In the process, we must

6 try to minimize any potential conflict between the two

7 provisions.  Fortunately, non-bankruptcy federal law suggests a

8 possible solution.  There are certain instances outside of

9 bankruptcy when federal law requires federal agencies and federal

10 courts to consider the reasonableness of percentage-fee or

11 commission-based compensation.  See Bjustrom v. Trust One Mortg.

12 Corp., 322 F.3d 1201, 1207-08 (9th Cir. 2003) (applying a two-

13 part test developed by the U.S. Dept. of Housing and Urban

14 Development to determine whether certain fees paid to mortgage

15 brokers were reasonable and hence permissible under § 8(c) of the

16 Real Estate Settlement Procedures Act ("RESPA"), 12 U.S.C.

17 § 2607(c)); Schuetz v. Banc One Mortg. Corp., 292 F.3d 1004, 1014

18
19
20

_____

21      [10](...continued)

22 would be entitled to primacy.  See Bulova Watch Co. v. United
States, 365 U.S. 753, 758 (1961).

23
      [11]We could give an alternate and plausible meaning to both
24 § 330(a)(3) and § 330(a)(7) if we were to assume that Congress
actually meant for § 330(a)(7) to apply to all trustees except
25 chapter 11 trustees, who would be subject only to § 330(a)(3).
But we cannot assume that Congress inadvertently included chapter
26 11 trustees within the scope of § 330(a)(7).  If Congress's
inclusion of chapter 11 trustees in § 330(a)(7)'s coverage was
27 inadvertent, it is up to Congress to fix the statute.  See Lamie
v. U.S. Trustee, 540 U.S. 526, 542 (2004).
28

1  (9th Cir. 2002) (same);[12] see also Bank of Lexington & Trust Co.

2  v. Vining-Sparks Sec., Inc., 959 F.2d 606, 613–14 (6th Cir. 1992)

3  (applying test articulated by Municipal Securities Rulemaking

4  Board to determine whether securities broker's markup on certain

5  securities constituted an unreasonable and hence fraudulent fee

6  under the Securities Exchange Act of 1934, 15 U.S.C. § 78j(b),

7  and under SEC Rule 10b-5).[13]

8      While these types of reasonableness reviews vary somewhat,

9  their overarching purpose is consistent and clear: to determine

10  whether there is a rational relationship between the duties to be

11  compensated by the commission rate and the nature and range of

12  services actually provided.  When a rational relationship exists,

13  the fee is presumed reasonable.  Moreover, in each of these

14  instances, federal courts applied standards that did not require

15  a lodestar analysis to determine the reasonableness of the fees

16  in question.

17      We acknowledge that these nonbankruptcy commission cases are

18  _____

19  [12]The Bjustrom/Schuetz test provides that a mortgage
broker's fees are reasonable for purposes of RESPA § 8(c) when:

20  "(1) the mortgage broker performed services that contributed to
the transaction, and (2) . . . the total compensation received by

21  the mortgage broker . . . was reasonably related to the services
provided."  Bjustrom, 322 F.3d at 1207 (citing Schuetz, 292 F.3d

22  at 1006).

23  [13]The Bank of Lexington test "requires brokers to sell

24  municipal securities at a price that is 'fair and reasonable,
taking into consideration all relevant factors, including the

25  best judgment of the broker . . . as to the fair market value . .
. , the expense involved in effecting the transaction, the fact

26  that the broker . . . is entitled to a profit, and the total
dollar amount of the transaction.'"  Bank of Lexington & Trust

27  Co., 959 F.2d at 613 (quoting Municipal Securities Rulemaking

28  Board Manual-General Rules, G-30 (CCH) ¶ 3646 (1985)).

1  not directly comparable with § 326's commission rates.  Most

2  significantly, Congress has set chapter 7 trustee commission

3  rates rather than the market.  But we know of no reason why

4  courts should second-guess Congress's clearly expressed intent to

5  fix trustee commission rates for the vast majority of cases,

6  especially given that Congress has set the duties that trustees

7  such as Hopkins must perform to earn that commission.

8      Accordingly, absent extraordinary circumstances, chapter 7,

9  12 and 13 trustee fees should be presumed reasonable if they are

10  requested at the statutory rate.  Congress would not have set

11  commission rates for bankruptcy trustees in §§ 326 and 330(a)(7),

12  and taken them out of the considerations set forth in

13  § 330(a)(3), unless it considered them reasonable in most

14  instances.  Thus, absent extraordinary circumstances, bankruptcy

15  courts should approve chapter 7, 12 and 13 trustee fees without

16  any significant additional review.  Indeed, the Office of the

17  United States Trustee has indicated that it will not object in

18  these circumstances if the trustee does not even keep

19  contemporaneous time records.[14]

20

21     [14]The statement appears on the United States Trustee's web
22  site in the form of a Frequently Asked Question on Trustee
   Compensation as follows:
23          Q: Are time records necessary to support a
       trustee's compensation?
24          A: United States Trustees will not require a
       trustee to provide time records to support trustee
25     compensation with regard to cases filed after October
       17, 2005.  It may, however, be prudent for a trustee to
26     keep time records to address objections raised by other
       parties or to satisfy requirements of the court.
27  FREQUENTLY ASKED QUESTIONS (FAQs) FOR TRUSTEES, available at
28                                              (continued...)

1      Against this background, we must assume that Congress

2 already has approved fees set as commissions in § 326 as

3 reasonable for the duties it has set out for such trustees in

4 § 704 and elsewhere in the Code.   In effect, Congress has set

5 both the duties of a trustee and the "market" rate for

6 compensation related to the delivery of those services.

7      On the other hand, if extraordinary circumstances exist, or

8 if chapter 11 trustee fees are at issue, the bankruptcy court may

9 be called upon in those cases to determine whether there exists a

10 rational relationship between the amount of the commission and

11 the type and level of services rendered.   In the case of a

12 chapter 11 trustee, this determination necessarily requires

13 consideration of the § 330(a)(3) factors, and also ordinarily

14 includes a lodestar analysis.   As for chapter 7, 12, and 13

15 trustee fees, when confronted with extraordinary circumstances,

16 the bankruptcy court's examination of the relationship between

17 the commission rate and the services rendered may, but need not

18 necessarily include, the § 330(a)(3) factors and a lodestar

19 analysis.   But bankruptcy courts still must keep in mind that

20 tallying trustee time expended in performing services and

21 multiplying that time by a reasonable hourly rate ordinarily is

22 beyond the scope of a reasonableness inquiry involving

23 commissions.   Simply put, a bankruptcy court that diminishes a

24 trustee's compensation from the statutorily-set rate errs if the

25 only basis offered for this diminution is a lodestar analysis.

26 

---

27     [14](...continued)
http://www.justice.gov/ust/eo/bapcpa/trustees_faqs.htm#trust_issue4
28 (last visited July 20, 2102).

1    Although the legislative history is silent on the specific

2    meaning and purpose of § 330(a)(7), our construction of

3    § 330(a)(7) generally is consistent with the overall purpose of

4    § 330, pursuant to which Congress sought to balance the general

5    bankruptcy interest of conserving estate assets with the goal of

6    fairly compensating bankruptcy trustees and professionals.[15]

7    Especially now, when the most a chapter 7 trustee can expect in

8    90% of his or her cases is a flat $60 fee, a commission-based

9    system for the other 10% has a certain symmetry to it.  Under the

10   system as Congress envisaged it, competent individuals with

11   marketable skills and experience will have incentives to work in

12   the bankruptcy area.  In that sense, § 330(a)(7) represents

13   Congress's latest effort to balance various competing policy

14   interests with respect to the work assigned and the compensation

15   paid to chapter 7 trustees.

16   **C.  Applying § 330(a)(7) to This Case**

17       Based on the law set forth above, the bankruptcy court erred

18   in determining Hopkins's fees.  The bankruptcy court did not

19   treat Hopkins's compensation as a commission based on § 326(a).

20   Instead, the court compared the fees requested to what it

21   considered a reasonable rate of compensation for the time Hopkins

22   and his paralegals actually spent working on the case.  The court

23   offered no other grounds for its decision.  In short, the

24   bankruptcy court substituted a different standard for the

25   _____

26       [15]For a detailed discussion of this legislative history, see

27   Burgess v. Klenske (In re Manoa Fin. Co.), 853 F.2d 687, 689-90
     (9th Cir. 1988) (citing H.R. Rep. No. 95-595, at 329-30 (1978),

28   reprinted in 1978 U.S.C.C.A.N. 5963, 6286; and, 124 Cong.Rec.
     33,994 (1978), reprinted in 1978 U.S.C.C.A.N. 6505, 6511).

1  appropriate method and rate of compensation for Hopkins in place

2  of the method and rate set by Congress.

3      When the bankruptcy court does not select and apply the

4  correct law, we typically remand so that the bankruptcy court can

5  apply the correct law to the facts of the case.  However, an

6  appellate court may decide a case on the facts previously found

7  when the record is sufficiently developed and there is no doubt

8  as to the appropriate outcome.  See, e.g., Wharf v. Burlington N.

9  R.R. Co., 60 F.3d 631, 637 (9th Cir. 1995); see also Weisgram v.

10  Marley Co., 528 U.S. 440, 456 (2000); Cuddeback v. Florida Bd. of

11  Educ., 381 F.3d 1230, 1236 n.5 (11th Cir. 2004).

12      In this instance, no further proceedings are necessary to

13  apply the facts to the correct law.  The record is complete and

14  establishes that there was nothing unusual, let alone

15  extraordinary, about the bankruptcy case or Hopkins's services.[16]

16  _____

17      [16]We thus leave for another day the issue of what facts

18  might qualify as extraordinary for purposes of activating the
bankruptcy court's duty to determine the reasonableness of the

19  § 326(a) commission rates.
    Cf. Trustee Compensation, in the United States Trustee's

20  Frequently Asked Questions about trustee compensation:
        Q: Is a trustee entitled to full statutory trustee

21      fees in all circumstances?
        A: 11 U.S.C. § 330(a)(7) provides that the trustee

22      fee is to be "treated as a commission." Absent

23      extraordinary factors, the United States Trustee will
        not object to a trustee receiving full commission on

24      all "moneys disbursed or turned over in the case by the
        trustee to parties in interest, excluding the debtor,

25      but including holders of secured claims." Extraordinary
        factors are expected to arise only in rare and unusual

26      circumstances and include situations such as where the

27      trustee's case administration falls below acceptable
        standards, or where it appears a trustee has delegated

28                                          (continued...)

22

1   Indeed, the bankruptcy court described both the case and

2   Hopkins's services as "routine."  Based on the law we have

3   articulated above, we are left with no doubt that, on these

4   facts, the court should have awarded Hopkins $1,315.41 in fees –

5   the full amount Hopkins had requested based on the compensation

6   rates set forth in § 326(a).

7                          **CONCLUSION**

8        For the reasons set forth above, we REVERSE the bankruptcy

9   court's fee award and REMAND this matter, with an instruction to

10  enter a new fee award in the full amount requested by Hopkins,

11  $1,315.41.

---

25       [16](...continued)

26       a substantial portion of his duties to an attorney or
         other professional.

27  FREQUENTLY ASKED QUESTIONS (FAQS) FOR TRUSTEES, <u>available at</u>
    http://www.justice.gov/ust/eo/bapcpa/trustees_faqs.htm#trust_issue4

28  (last visited July 20, 2012).

# U.S. Bankruptcy Appellate Panel
## of the Ninth Circuit

125 South Grand Avenue, Pasadena, California 91105
Appeals from Central California (626) 229-7220
Appeals from all other Districts (626) 229-7225

## NOTICE OF ENTRY OF JUDGMENT

**BAP No.: ID-11-1389-MkHJu**

**RE:      ANDY N. SALGADO-NAVA**

A separate Judgment was entered in this case on **07/25/2012.**

## BILL OF COSTS:

Bankruptcy Rule 8014 provides that costs on appeal shall be taxed by the Clerk of the
Bankruptcy Court. Cost bills should be filed with the Clerk of the Bankruptcy Court
from which the appeal was taken. 9th Cir. BAP Rule 8014-1

## ISSUANCE OF THE MANDATE:

The mandate, a certified copy of the judgment sent to the Clerk of the Bankruptcy
Court from which the appeal was taken, will be issued 7 days after the expiration of the
time for filing a petition for rehearing unless such a petition is filed or the time is
shortened or enlarged by order. See Federal Rule of Appellate Procedure 41.

## APPEAL TO COURT OF APPEALS:

An appeal to the Ninth Circuit Court of Appeals is initiated by filing a notice of appeal
with the Clerk of this Panel. The Notice of Appeal should be accompanied by payment
of the $455 filing fee and a copy of the order or decision on appeal. Checks may be
made payable to the U.S. Court of Appeals for the Ninth Circuit. See Federal Rules of
Appellate Procedure 6 and the corresponding Rules of the United States Court of
Appeals for the Ninth Circuit for specific time requirements.

<u>CERTIFICATE OF MAILING</u>

The undersigned, deputy clerk of the U.S. Bankruptcy Appellate Panel of the Ninth Circuit, hereby certifies that a copy of the document on which this certificate appears was transmitted this date to all parties of record to this appeal.

**By:** Vincent Barbato, Deputy Clerk

**Date:** July 25, 2012